No. 13-7066

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**DIRECT SUPPLY, INC.**
Plaintiff-Appellee

v.

**SPECIALTY HOSPITALS OF AMERICA, LLC and SPECIALTY
HOSPITALS OF WASHINGTON, LLC**,
Defendants-Appellants

**NOT-FOR-PROFIT HOSPITAL CORPORATION**
Defendant-Appellee

_____

Appeal from the United States District Court
for the District of Columbia
(Hon. James S. Gwin)
Case No. 1:11-cv-00683-JSG

_____

**BRIEF OF PLAINTIFF-APPELLEE DIRECT SUPPLY, INC.**

_____

Douglas S. Crosno DC Bar # 482017
HOGAN LOVELLS US L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
(202) 637-6885
(202) 637-5910 (fax)

Attorneys for Plaintiff-Appellee Direct Supply,
Inc.

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Plaintiff Appellee Direct Supply, Inc., by and through the undersigned counsel, hereby certifies as follows:

**(A) Parties**.  Defendants-Appellants in this case are Specialty Hospitals of America, LLC and Specialty Hospitals of Washington, LLC.  Plaintiff-Appellee in this case is Direct Supply, Inc.  Defendant-Appellee in this case is Not-for-Profit Hospital Corporation.  There are no *amici* or intervenors.

Pursuant to Circuit Rule 26.1, Plaintiff-Appellee Direct Supply, Inc., by and through the undersigned counsel, hereby identifies the following parent corporations and publicly held corporations, if any, that own 10% or more of its stock:  None.

**B.     Rulings Under Review**. The ruling under review is the March 27, 2013 Memorandum Opinion and Order granting Plaintiff-Appellee Direct Supply, Inc.'s Motion for Summary Judgment, which is reproduced in the Appendix at pages 969 to 977.

**C.     Related Cases**.     The case on review has not previously been before this Court or currently pending before any court in the District of Columbia.  To the knowledge of the Plaintiff-Appellee, there are no cases currently before this Court involving substantially the same parties or issues.

Respectfully Submitted,

/s/ Douglas S. Crosno
Douglas S. Crosno DC Bar # 482017
HOGAN LOVELLS US L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
(202) 637-6885
(202) 637-5910 (fax)

Attorneys for Plaintiff- Appellee Direct
Supply, Inc.

# TABLE OF CONTENTS

<u>**Page**</u>

CERTIFICATE OF PARTIES, RULINGS AND RELATED CASES .................... i

TABLE OF AUTHORITIES ................................................................. iv

GLOSSARY OF ABBREVIATIONS ...................................................... vi

STATEMENT OF THE ISSUES ............................................................1

INTRODUCTION ...............................................................................1

STATEMENT OF FACTS ....................................................................3

SUMMARY OF THE ARGUMENT .......................................................12

ARGUMENT ...................................................................................13

I.    THE DISTRICT COURT CORRECTLY GRANTED SUMMARY
      JUDGMENT IN FAVOR OF DIRECT SUPPLY ...........................................13

A.    Specialty Hospitals' Frustration of Purpose Defense is Without Merit ...........17

B.    The Impossibility of Performance Defense Also is Without Merit .................22

II.   DIRECT SUPPLY HAS A VALID CLAIM FOR QUANTUM
      MERUIT ...................................................................................25

CONCLUSION ................................................................................26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

A-Leet Leasing Corp. v. Kingshead Corp.,
  375 A.2d 1208 (N.J. App. 1977) .......................................................................19

Bettis v. Hall,
  2011 WL 1430327 (D.Kan. April 14, 2011) .....................................................26

Days Inn of America, Inc. v. Patel,
  88 F.Supp.2d 928 (C.D.Ill. 2000) .....................................................................19

*East Capitol View Community Development Corp., Inc. v. Robinson,
  941 A.2d 1036 (D.C. 2008) ...............................................................................23

Everything Parking, Inc. v. Houston Economic Development Ass'n,
  2011 WL 2215716 (M.D.Ala. June 7, 2011).....................................................26

Ford v. Pacific Webworks, Inc.,
  2011 WL 529265 (N.D.Ill. Feb. 4, 2011) ..........................................................26

General Elec. Capital Corp. v. Charleston,
  1989 WL 63213 (E.D.Pa. June 12, 1989)..........................................................19

Harrington v. Trotman,
  983 A.2d 342 (D.C. 2009) ............................................................................21, 24

*Island Development Corp. v. District of Columbia,
  933 A.2d 340 (D.C. 2007) ............................................ 14, 15, 16, 18, 20, 21, 22

Operate Co. of Boston, Inc. v. Wolf Trap Foundation for Performing Arts,
  817 F.2d 1094 (4th Cir. 1987) ...........................................................................24

RehabCare Group East, Inc. v. SAK Management Services, LLC,
  2010 WL 3307084 (N.D. Ill. Aug. 18, 2010) ....................................................25

Tsintolas Realty Co. v. Mendez,
  984 A.2d 181 (D.C. 2009) .................................................................................13

\*   Authorities upon which we chiefly rely are marked with asterisks

iv

**OTHER AUTHORITIES**

30 <u>Williston on Contracts</u>, §77:95 (4th Ed. 2013)....................................................19

*Restatement (Second) of Contracts: Discharge by Supervening Impracticability* § 261 (1981)................................................................15, 16, 22

*Restatement (Second) of Contracts: Discharge by Supervening Frustration* § 265 (1981)............................................................................14, 15, 18

# GLOSSARY OF ABBREVIATIONS

SHA         Specialty Hospitals of America, LLC

SHW         Specialty Hospitals of Washington, LLC

NFP         Not-for-Profit Hospital Corporation

D.C.        District of Columbia

UMC         United Medical Center

## STATEMENT OF THE ISSUES

Did the District Court correctly grant summary judgment in favor of Plaintiff-Appellee Direct Supply, Inc. ("Direct Supply") on its claim for breach of contract against Defendants-Appellants Specialty Hospitals of America, LLC ("SHA") and Specialty Hospitals of Washington, LLC ("SHW") (collectively, "Specialty Hospitals") and properly reject Specialty Hospitals' affirmative defenses to the claim of "frustration of purpose" and "impossibility of performance."

## INTRODUCTION

This is a straight-forward case, in which all of the material facts were undisputed and the legal conclusion to be drawn from those undisputed facts was clear. Direct Supply entered into two contracts to deliver certain products and services to Specialty Hospitals, which at the time was the operator of the medical facility doing business as United Medical Center ("UMC"). It is undisputed that those products were delivered to Specialty Hospitals and that Direct Supply complied with all of the other terms and conditions of the contracts at issue. It is also undisputed that Specialty Hospitals failed to pay all amounts due to Direct Supply under the contracts and that there is an outstanding balance of over $460,000, not including interest and other costs. In fact, prior to the filing of this

1

lawsuit, Specialty Hospitals repeatedly acknowledged, both orally and in writing, that it was liable to Direct Supply for payment of the outstanding balance.

Based on those undisputed facts and Specialty Hospitals' own admission of liability, the District Court quite properly granted summary judgment in favor of Direct Supply on its claim for breach of contract. Furthermore, the <u>only</u> argument that Specialty Hospitals made in the proceedings below and on this appeal – which is that it should be excused from its clear contractual obligation to pay pursuant to the doctrines of frustration of purpose and impossibility of performance – is to no avail. The basis of Specialty Hospitals' frustration and impossibility defenses is that the Defendant-Appellee Not-for-Profit Hospital Corporation ("NFP"), an entity created by the District of Columbia government, took over the UMC and evicted Specialty Hospitals from the facility and is now in possession of the products that Direct Supply delivered. According to Specialty Hospitals, the NFP's takeover and eviction – which took place in July 2010 – supposedly "frustrated" the purpose of the contract between Specialty Hospitals and Direct Supply and made it "impossible" for it to pay Direct Supply.

However, that argument is specious and was properly rejected by the District Court. The most significant, but by no means only, flaw in Specialty Hospitals' defense is that <u>under the terms of the contracts it was obligated to make final payment to Direct Supply in April 2009, fourteen months before the occurrence of</u>

2

the event that "frustrated" the purpose of the contract and made it "impossible" for Specialty Hospitals to pay. Thus, Specialty Hospitals was in breach of its contracts and indisputably owed money to Direct Supply long before NFP came along. Nothing in either the frustration of purpose or impossibility of performance doctrine excuses a party from a pre-existing contractual breach, as Specialty Hospitals is asking this Court to do here. For those and the other reasons discussed in more detail below, the District Court's decision should be affirmed.

## STATEMENT OF FACTS

### I.     SPECIALTY HOSPITALS BREACHES ITS CONTRACTS WITH DIRECT SUPPLY

On or about November 7, 2007, Specialty Hospitals entered into an agreement with the District of Columbia government to operate the hospital doing business as United Medical Center ("UMC") f/k/a Greater Southeast Community Hospital in Washington, DC. Appendix ("App.") at 443-468. Prior to that agreement, UMC was owned and operated by the government of the District of Columbia. Id. Pursuant to the November 2007 agreement, Specialty Hospitals owned and operated various medical facilities at the UMC campus. Id.

On August 21, 2008 and February 23, 2009, Direct Supply entered into two contracts to deliver certain products and services to Specialty Hospitals App. at 188-89; 193-229. Pursuant to the terms of those contracts – referred to as the "Products & Services Agreements," Direct Supply was to provide various

products that were to be used by Specialty Hospitals in connection with a Skilled

Nursing Facility and Long Term Acute Care Hospital that it operated at the UMC

campus.  App. at 189.  In exchange, Direct Supply was to receive payment from

Specialty Hospitals for such products, net 30 days from the date of Direct Supply's

invoice.  App. at  189; 213; 227.  It was not disputed below that Direct Supply

provided all products and services in accordance with the terms of the Products &

Services Agreements and has otherwise fully complied with the terms and

conditions of the Products & Services Agreements.  See Brief of Appellants ("App.

Brief") at p. 9; App. at 393.   In particular, Direct Supply provided all of the

products required under the August 2008 Products & Services Agreement by

March 26, 2009, and submitted its final invoice under that contract to Specialty

Hospitals on March 27, 2009.  App.  at 189.  Direct Supply provided all of the

products and services required under the February 2009 Products & Services

Agreement by March 25, 2009, and submitted its final invoice under that contract

to Specialty Hospitals on March 27, 2009.  Id.   Thus, pursuant to the terms of the

Products & Services Agreements,  Specialty Hospital's payments were due 30 days

after the dates the final invoices were submitted, or no later than April 26, 2009.  In

fact, before this action was filed, Specialty Hospitals acknowledged that Direct

Supply complied with its obligations under the Products & Services Agreements

and that payment was due to Direct Supply.   App. at 190; 231; 233-37.

Beginning on or about July 1, 2009, Direct Supply made multiple demands to Specialty Hospitals for payment of the amounts due to it under the Products & Services Agreements.  App.  at 190.  However, despite repeated demands for payment, Direct Supply did not pay the outstanding balance in full.  App.  at 189-190.  As of the date that this action was filed, the unpaid balance due and payable to Direct Supply under the Products & Services Agreements was $462,055.17, not including interest and attorney fees and other costs, which are also recoverable under the Products & Services Agreements.   App. at 189-90.

Notably, although it did not comply with its payment obligations, Specialty Hospitals repeatedly acknowledged both orally and in writing that it was liable for repayment of all amounts due under the Products & Services Agreements.  For example, by letter dated August 21, 2009, Ryan Wilson, Regional Controller for Specialty Hospitals, acknowledged Specialty Hospitals' obligation to pay the outstanding balance under the Products & Services Agreements and memorialized an agreement between Direct Supply and Specialty Hospitals pursuant to which Specialty Hospitals would repay the balance by making bi-weekly payments to Direct Supply in the amount of $25,000 (the "August 21, 2009 Letter Agreement") See App. at 190; 193.  By e-mail dated June 9, 2010, Mr. Wilson once again acknowledged Specialty Hospitals' liability for the outstanding debt and submitted a proposed revised payment schedule under which Specialty Hospitals would pay

the then existing balance by making a single payment of $50,000 on or before June 30, 2010, to be followed by six (6) consecutive monthly payments in the amount of $76,238.66.  App. at 190; 233-237.   However, despite that acknowledgement of liability and multiple promises to pay, Specialty Hospitals did not satisfy this outstanding debt.

## II.     THE D.C. GOVERNMENT TAKEOVER OF UMC

On July 9, 2010, the government of the District of Columbia once again assumed control of UMC.   App.  at 30-41,  In furtherance of this takeover, the District of Columbia formed NFP and charged it with the responsibility of operating UMC.  Id.  The Mayor of the District of Columbia also issued Mayoral Order 10-117, pursuant to which all "rights and obligations" belonging to UMC were "transferred to the jurisdiction and control of" NFP.  App.  at 248-249.  Specialty Hospitals has maintained that the District of Columbia's takeover of UMC and NFP's assumption of control over the facility was improper.  See generally App. at 15-16.

Nevertheless, even after the District of Columbia's takeover and the issuance of Mayoral Order 10-117, Specialty Hospitals continued to acknowledge its liability for repayment of the balance owed under the Products & Services Agreements.  In fact, Specialty Hospitals made at least one payment towards the outstanding balance on this account following the takeover, on July 30, 2010.  App.

at 190-191; 239-242.  Moreover, in the fall of 2010, Eric Rieseberg, the co-founder and Officer of Specialty Hospitals, informed representatives of Direct Supply that he would work with Direct Supply to pay the balance owed to it.  App. at 243-244.

However, by e-mail dated December 22, 2010, counsel for Specialty Hospitals, Kenneth Rosenau, advised Direct Supply that his client was now taking the position that NFP was liable for the payment of the outstanding balance.  App. at 251.    Mr. Rosenau further advised that the basis for that position was the provision in Mayoral Order 10-117 stating that all "obligations" of UMC were transferred to NFP.  App. at 251.

By letter dated January 26, 2011, Direct Supply advised Mr. Rosenau that the views expressed in his December 22, 2010 e-mail were contrary to the previous statements and actions of his client, as Specialty Hospitals had (as noted above) repeatedly acknowledged liability for the outstanding balance under the Agreements even after Mayoral Order 10-117 was issued.  App. at 253-254.  In that same letter, Direct Supply also once again requested repayment of the existing balance due on the account.  Id.  Specialty Hospitals did not respond to that letter. App. at 246.

Direct Supply also sent a letter to NFP on January 26, 2011, in which it informed NFP of the position taken by Specialty Hospitals regarding NFP's liability for the outstanding balance due under the Agreements.  See App.  at 260-

261.   Direct Supply also requested that NFP advise as to whether it agreed with

Specialty Hospitals' interpretation of Mayoral Order 10-117 and, if so, when

Direct Supply could expect to receive payment of the outstanding balance owed to

it.  Id.  NFP did not respond to the January 26, 2011 letter.  App.  at 246.

## III.   SUMMARY OF RELEVANT DISTRICT COURT PROCEEDINGS AND ARGUMENTS MADE BELOW

With NFP and Specialty Hospitals essentially pointing fingers at each other,

Direct Supply commenced this lawsuit on April 6, 2011.   App. at 1.  The

Complaint contained counts against Specialty Hospitals for breach of contract and

quantum meruit, both of which are based upon its failure to pay amounts that are

indisputably owed to Direct Supply under the contracts at issue.   App. at 5, 6.  In

the alternative, the Complaint also alleged claims against NFP, and sought to hold

NFP liable if and to the extent that Specialty Hospitals' position was correct and

liability for the amounts due under the Direct Supply contracts was actually

transferred to NFP.  App. at 7-8.

On April 28, 2011, the Specialty Hospitals defendants filed motions to

dismiss, in which they claimed that the District of Columbia government was

supposedly a necessary and indispensable party that should have been joined to

this action under Rule 19.  App. at 13.  On April 29, 2011, NFP filed a motion to

dismiss, in which it contended that it was not liable for the amounts due and

payable under the Agreements and disputed Specialty Hospitals' claim that

Mayoral Order 10-117 transferred that liability to it.   App. at 77-88.

On May 16, 2011, Direct Supply filed oppositions to the respective motions

to dismiss filed by the defendants.  App. at  159-168.  In addition, Direct Supply

also filed a motion for summary judgment.  App. at 166-187.  That motion asked

the District Court to resolve the principal issue in dispute in this case:  which

defendant, Specialty Hospitals or NFP, is liable for the debt that is indisputably

owed to Direct Supply.  Id.  By order of the Court, briefing on the motion for

summary judgment was stayed pending a ruling on the defendants' motions to

dismiss.

On July 27, 2012, the District Court (J. Gwin presiding) entered an order

denying Specialty Hospital's motion to dismiss in its entirety.  App. at 330-343.

That order also granted NFP's motion to dismiss in part, as the District Court

concluded that Specialty Hospital's contractual liability was not transferred to NFP

pursuant to Mayoral Order 10-117 and therefore dismissed the breach of contract

claim.  App. at  334-349.  However, the Court denied NFP's motion with respect to

the quantum meruit count.  App. at at 339-341.

Specialty Hospitals and NFP thereafter filed oppositions to Direct Supply's

motion for summary judgment.  App. at 390, 765.  NFP also filed a cross-motion

for summary judgment as well as yet another motion to dismiss, in which it

contended (among other things) that the quantum meruit claim against it should be dismissed pursuant to the doctrine of sovereign immunity.  App.  at 765, 771.

Specialty Hospitals' opposition to the motion for summary judgment was notable for what it conceded.  In particular, Specialty Hospitals specifically admitted that Direct Supply performed all of its obligations under the Products & Services Agreements and that Direct supply was owed money as a result.  App.  at 393.  In Specialty Hospitals' own words, "Specialty *does not* dispute that Direct Supply provided the goods and services to the United Medical Center ("UMC") and the skilled nursing facility ("SNF") and long term acute care hospital ("LTACH") as required under the underlying contract and invoices."  Id. (Emphasis in original).  Instead, Specialty Hospitals' only argument in its summary judgment brief was that the D.C. government's takeover of the UMC in July 2010 – more than one year after final payment was due and payable to Direct Supply – supposedly "frustrated" or rendered "impossible" Specialty Hospital's pre-existing obligation to pay the outstanding balance due under the Products & Services Agreements.  App. at 399-404.

Specialty Hospitals further argued that the District Court should hold NFP liable (under Direct Supply's quantum meruit theory) for a portion of the outstanding balance, based on NFP's possession of the goods delivered under the contracts following NFP's takeover of the UMC in July 2010.  App. at 404.  Thus,

10

according to Specialty Hospitals, the issue for the District Court to decide was one of apportionment of liability between the defendants or " 'against whom, and in what percentage, shall judgment enter?"  App. at 393.

In an opinion and judgment dated March 27, 2013, the District Court (J. Gwin presiding) answered that question, granting summary judgment in favor of Direct Supply and against Specialty Hospitals.   App. at 969-978.  The District Court concluded that there were valid contracts between Direct Supply and Specialty Hospitals,  that it was undisputed that Specialty Hospitals had failed to pay all amounts due under those contracts, and that Specialty Hospitals' defenses all failed as a matter of law.  App. at 973-76.  The District Court therefore ordered Specialty Hospitals to pay the outstanding balance owed under the contracts, along with interest, late charges, costs and attorney's fees.  App. at 976-978.

Having held that Specialty Hospitals was liable for the entire unpaid debt, the District Court specifically declined to address Direct Supply's alternative claims against NFP as well as NFP's various defenses to those claims.   App. at 976.  Thus, the District Court concluded that it "need not reach this [the claims and defenses involving NFP] issue."   Id. It therefore denied NFP's cross-motions to dismiss and for summary judgment as moot.   Id.

On April 25, 2013, Specialty Hospitals filed a notice of appeal of the March 27, 2013 opinion and judgment.  App. at 979.

## SUMMARY OF THE ARGUMENT

The argument that Specialty Hospitals presents on appeal – that its pre-existing contractual obligation to pay Direct Supply the outstanding balance due under the Products & Services Agreements was somehow excused by the doctrines of frustration of purpose and/or impossibility of performance – is clearly wrong. Simply put, this case does not present the kind of extreme circumstances that would warrant the application of either of those defenses. The most glaring but by no means only problem with Specialty Hospitals' position is that Direct Supply had already fully performed all of its contractual obligations – and Specialty Hospitals was already in breach of its corresponding duty to pay for those services provided by Direct Supply – some fourteen months before the occurrence of the event that supposedly "frustrated" the purpose of the contract and rendered Specialty Hospitals' ability to pay "impossible." Specialty Hospitals' position also is undermined by the fact that it continued to acknowledge its contractual duty to pay Direct Supply even after the D.C. government takeover of the UMC, thus belying any notion that the purpose of the contract was "frustrated" or that it believe performance was "impossible." Finally, Specialty Hospitals' argument is inconsistent with the equitable nature of the frustration and impossibility defenses, which simply are not intended to reward a wrongdoer that fails to honor its debts like Specialty Hospitals.

12

# ARGUMENT[1]

## I.    THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT IN FAVOR OF DIRECT SUPPLY

The District Court's decision entering summary judgment in favor of Direct Supply and against Specialty Hospitals on the breach of contract claim was clearly correct and should be affirmed.

In order to succeed on such a claim, a plaintiff must establish: (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach. <u>Tsintolas Realty Co. v. Mendez</u>, 984 A.2d 181, 187 (D.C. 2009).  Each of those elements is certainly present in this case.   There was no dispute in the proceedings below that the Products & Services Agreements were valid contracts, that Specialty Hospitals owed an obligation or duty under those contracts –to pay for the products and services that Direct Supply provided thereunder – that Specialty Hospitals breached that duty by failing to pay the amounts due, or that Direct Supply suffered damages as a result of that breach, namely the outstanding balance due to it under the Agreements that Specialty Hospitals failed to pay.

In fact, in its appellate brief Specialty Hospitals readily concedes that it breached the Products & Services Agreements.  App. Brief at p. 9.  Its sole

---

[1] The statement in Specialty Hospitals' brief outlining the applicable standards of review is satisfactory to Direct Supply.

argument[2] on appeal is that it should be excused from liability under the doctrines of "frustration of purpose" and "impossibility of performance."  According to Specialty Hospitals, the "purpose" of the Products & Services Agreements was "frustrated," and it supposedly became "impossible" for it to perform its outstanding obligations under the contracts – namely, the obligation to pay the outstanding balance due – because NFP has taken over the UMC and consequently is now in possession and control of the products that were delivered under the contracts.

However, neither of those doctrines is applicable here.  The concepts of "frustration of purpose" and "impossibility of performance" are closely related. Island Development Corp. v. District of Columbia, 933 A.2d 340, 349 (D.C. 2007). The "frustration of purpose" defense provides that if "a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary."  Id. (citing Restatement (Second) of Contracts: Discharge by Supervening Frustration § 265 (1981)).  Similarly, the doctrine of "impossibility of performance" provides that if

---

[2] Thus, Specialty Hospitals has abandoned the argument that it made prior to the filing of this lawsuit, which was that its liability under the Products & Services Agreements was transferred to NFP pursuant to Mayoral Order 10-117.

"after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary." Id. (citing *Restatement (Second) of Contracts: Discharge by Supervening Impracticability* § 261 (1981)).

However, courts have made clear that the "frustration of purpose" and "impossibility of performance" defenses are rarely successfully and only available in "extreme circumstances." Id. at 350. In order for the frustration of purpose defense to apply, the "frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract." Id. (citing *Restatement* § 265). Consequently, the defense is not applicable merely because "the promissor's performance has become different or impracticable." Id. at 349.

In a similar vein, the defense of impossibility of performance is only available if (among other factors) there is an "occurrence of [a] contingency" that has "rendered performance commercially impracticable." Id. at 350 (citing Transatlantic Financing Corp. v. United States, 363 F.2d 312, 315-16 (D.C. Cir. 1966)). However, for this defense to be triggered there must be "be a real impossibility and not a mere inconvenience or unexpected difficulty." Id.; see also Transatlantic Financing Corp., 363 F.2d at 319 (holding that the closure of the

Suez Canal due to international conflict did not render a shipping contract

impossible when an alternative route around the Cape of Good Hope was

available). That is because a *"*party is expected to use reasonable efforts to

surmount obstacles to performance ..., and a performance is impracticable only if it

is so in spite of such efforts." <u>Island Development</u>, 933 A.2d at 350 (citing

*Restatement* § 261 cmt. d.).

      This case simply does not present the kind of "extreme circumstances" that

would warrant the application of the frustration of purpose or impossibility of

performance doctrines. Although Specialty Hospitals' frustration and impossibility

defenses suffer from numerous deficiencies – which are addressed in more detail

below – each of them share a fundament, fatal flaw: the event that supposedly

"frustrated" the purpose of the Products & Services Agreement and rendered

Specialty Hospitals' performance "impossible" – <u>i.e.</u> the D.C. government takeover

of the UMC – <u>occurred long after Specialty Hospitals obligation to pay Direct</u>

<u>Supply had accrued and Specialty Hospitals was in breach of that obligation</u>. As

noted above, Direct Supply fully performed all of its obligations under the

contracts, and final payment for all goods delivered and services rendered was due

to Direct Supply by no later than April 26, 2009. <u>See</u> *supra* at p. 4. Nor is there

any dispute that Specialty Hospitals was in breach of that payment obligation. To

the contrary, both before this lawsuit was filed and in multiple filings in this

lawsuit – including most recently in its appellate brief – Specialty Hospitals conceded that it failed to pay amounts due and that it was in breach of contract. However, the D.C. government did not take over UMC until July 2010, some 14 months after Specialty Hospitals had already breached the contracts.

Specialty Hospitals has not and cannot cite a single case in which a party has successfully invoked either the frustration of purpose or impossibility of performance defense based on an event that occurred long after the party was already in breach of its obligations. That is hardly surprising, because as discussed below it would be patently contrary to the defenses of frustration of purpose and impossibility of performance defense to apply them in such circumstances. Thus, the District Court's ruling should be affirmed.

### A.     Specialty Hospitals' Frustration of Purpose Defense is Without Merit

As just noted, although there are several reasons why Specialty Hospitals' frustration of purpose defense fails, perhaps the most obvious one is that Specialty Hospitals had a duty to pay Direct Supply – and was in breach of that duty – more than one year before the July 2010 takeover of UMC, the event that supposedly "frustrated" the purpose of the parties' contracts. As the District Court correctly held, frustration of purpose "occurs before the promisee's performance," because this "affirmative defense envisions an event occurring after the contract's offer and

17

acceptance, but before the parties have done what they contracted to do." App. at

974 (citing *Restatement* § 265, illustration 1).

In fact, as noted in the aforementioned <u>Island Development</u> decision, a case

that Specialty Hospitals relies upon heavily, for this defense to apply in the first

place  the "frustration must be so severe that it is not fairly to be regarded as within

the risks that he assumed under the contract."  933 A.2d at 350 (citing *Restatement*

§ 265).  As a result, a party will not be excused from performance under the

frustration of purpose doctrine based on a risk that "is assumed under the contract"

or if to excuse performance would otherwise be contrary to the terms of the

contract.  <u>Id</u>. at 349 (promisor's obligation to perform "is discharged, <u>unless the</u>

<u>language or the circumstances indicate the contrary</u>."  ) (citations omitted)

(emphasis added).

In this case, to excuse Specialty Hospitals from its <u>pre-existing</u> contractual

obligation to pay Direct Supply the outstanding balance due under the Products &

Services Agreements would certainly be contrary to the terms of the parties'

contracts.  The Products & Services Agreements unambiguously provided, without

exception, that final payment was due within 30 days of the issuance of the final

invoice, which as noted previously means that Specialty Hospitals was required to

pay all amounts due on or about April 26, 2009.  App. at 189, 213, 227.  Thus,

anything that happened after that date is utterly irrelevant to Specialty Hospitals'

18

obligation to pay.  There is absolutely no language in the contracts, and Specialty Hospitals certainly has not pointed to any, that somehow relieves it of its contractual obligation to pay based on an event that happened some 14 months after payment was due.

Courts in analogous circumstances have made clear that the frustration of purpose defense is unavailable where, as is the case here, the party asserting that defense was already in breach at the time of the alleged "frustrating" event.  <u>See, e.g.,</u><u>Days Inn of America, Inc. v. Patel</u>, 88 F.Supp.2d 928, 934 (C.D.Ill. 2000) ("Patel had breached the franchise agreement prior to the event which allegedly constituted grounds relieving him of his duties based upon the doctrine of commercial frustration.  As such, the doctrine of commercial frustration is inapposite in this case.");  <u>General Elec. Capital Corp. v. Charleston</u>, 1989 WL 63213, at *2 (E.D.Pa. June 12, 1989) (defense is "inapplicable if the party claiming relief under the doctrine had breached the contract prior to frustration."); <u>A-Leet Leasing Corp. v. Kingshead Corp.</u>, 375 A.2d 1208, 1214 (N.J. App. 1977) (the frustrating event must have occurred "before breach"); <u>see also</u> 30 <u>Williston on Contracts</u>, §77:95 (4th Ed. 2013) (under the frustration of purpose doctrine "contracts are construed to contain an implied condition that the parties are to be excused <u>if, before a breach</u>, the state of things which constitute a fundamental basis

19

of the contract ceases to exist without the fault of either party.") (emphasis added).
This Court should join that line of precedent.

Furthermore, Specialty Hospitals' own actions belie any notion that the D.C.
government's takeover of the UMC "frustrated" the "purpose" of the Products &
Services Agreements and relieve it of any obligation to pay the amounts that it
indisputably owes under those contracts.  Prior to the July 2010 takeover, Specialty
Hospitals confirmed in multiple communications that it was liable for the
outstanding balance, and never stated or even suggested that this existing liability
could be extinguished by any other event besides actual payment of the amount
due by Specialty Hospitals.  See App. at 189-190; 231; 233-237.  Moreover, even
after the D.C. government takeover, Specialty Hospitals continued to acknowledge
its liability under the Products & Services Agreements, and in fact Specialty
Hospitals made at least one partial payment towards the outstanding balance after
the takeover.  App. at 190-91; 239-242; 243-244.

In addition, the frustration of purpose defense is not triggered merely
because "the promissor's performance has become different or impracticable."
Island Development, 933 A.2d at 349.  This is a clear example of a case in which a
party is attempting to avoid its contractual obligations because it believes
performance is now "impracticable," as Specialty Hospitals believes that it should
not have to pay what it owes because another party, NFP,  now has the use of the

products that Direct Supply delivered. However, the fact remains that Specialty

Hospitals was required to pay for those products in April 2009. That NFP

subsequently began using those products some fourteen months later does not

relieve Specialty Hospitals from its pre-existing contractual obligation to pay.

Furthermore, if Specialty Hospitals believes that NFP's seizure and continued use

of those products is wrongful – as Specialty Hospitals clearly does – then the

proper course would be for it to assert its own claim against NFP. What Specialty

should <u>not</u> be permitted to do is simply breach its contractual duty to an innocent

third-party like Direct Supply.

Finally, it is important to note that the frustration of purpose defense is

equitable in nature. <u>Harrington v. Trotman</u>, 983 A.2d 342, 347 (D.C. 2009). Thus,

it is not available to a party with unclean hands. <u>See</u> <u>Island Development</u>, 933

A.2d at 349 (defense is applicable only if the party is "without fault"). Application

of the defense in these circumstances would clearly be inequitable. After all, there

is <u>no</u> dispute that Direct Supply complied with all of its obligations under the

contracts, that Specialty Hospitals used and enjoyed the products that Direct

Supply delivered for over one year, and that Specialty Hospitals simply failed to

pay for those products. An equitable doctrine like frustration of performance is not

intended to reward a wrongdoer like Specialty Hospitals with a "free ride."

Accordingly, this Court should reject Specialty Hospitals' baseless invocation of the frustration of purpose defense and affirm the District Court's decision.

### B.     The Impossibility of Performance Defense Also is Without Merit

For similar reasons, Specialty Hospitals' impossibility of performance defense likewise fails and was correctly rejected by the District Court.  As with the frustration defense, the impossibility defense is not available here because Specialty Hospitals was obligated to pay the outstanding balance under the Products & Services Agreements beginning in April 2009 – more than one year before NFP took over the UMC, the event that supposedly made performance under the contracts "impossible."  Thus, the impossibility of performance defense is inapplicable on its face.

Also like the doctrine of frustration of purpose, a party will not be excused from performance under the impossibility doctrine based on a risk that is assumed under the contract or if to excuse performance would otherwise be contrary to the terms of the contract.  Island Development, 933 A.2d at 349 (citing *Restatement* § 261).  As explained in the preceding section, excusing Specialty Hospitals from its duty to pay based on an event that took place in July 2010 would be contrary to the terms of the Products & Services Agreements, which required Specialty Hospitals to pay the outstanding balance due in April 2009.

22

In addition, the party asserting the defense of impossibility bears the burden of proving "'a real impossibility and not a mere inconvenience or unexpected difficulty.'" East Capitol View Community Development Corp., Inc. v. Robinson, 941 A.2d 1036, 1040 (D.C. 2008) (citing cases). Thus, "courts will generally only excuse non-performance where performance is objectively impossible—that is, the contract is incapable of performance by anyone." Id. (citing cases and noting that the "impossibility which will, or may, excuse the performance of a contract must exist in the nature of the thing to be done. It must not exist merely because of the inability or incapacity of the promisor or obligor to do it. . . ) (emphasis added). Therefore, it is "generally well settled that subjective impossibility, that is, impossibility which is personal to the promisor and does not inhere in the nature of the act to be performed, does not excuse performance." Id. (emphasis added).

Here, payment of the existing due under the Products & Services Agreements is not "objectively impossible." Indeed, someone clearly can (and should) pay the outstanding balance. The fact that Specialty Hospitals somehow thinks it should be excused from paying what it indisputably owes because it was evicted from the UMC campus is a perfect example of a purported "impossibility which is personal to the promisor and does not inhere in the nature of the act to be performed," which simply "does not excuse performance."

23

In fact, as noted previously, Specialty Hospitals made at least one payment towards the outstanding balance even after the D.C. government takeover on July 9, 2010.  Furthermore, in its papers below it specifically conceded that "Specialty's payment is still possible."  App. at 402.  Thus, based on Specialty Hospitals' own words and actions, it is apparent that the impossibility of performance defense is inapplicable.

Finally, like the frustration defense, the doctrine of impossibility of performance is equitable in nature.  Harrington, 983 A.2d at 347; see also Opera Co. of Boston, Inc. v. Wolf Trap Foundation for Performing Arts, 817 F.2d 1094, 1100 (4th Cir. 1987) ("we accept as the correct statement of the modern and prevailing doctrine of impossibility of performance as a defense to a breach of contract to be essentially as equitable in character").  For the reasons discussed above, allowing Specialty Hospitals to simply walk away from its debt would plainly be an inequitable result.  Moreover, excusing a debtor from such a pre-existing duty to pay – based on an unrelated, subsequent event – would also create perverse incentives.  Or, as the District Court aptly explained, a ruling that would excuse Specialty Hospitals from this indisputable contractual liability "would incent promisors to withhold payment indefinitely" in the hopes that some event would occur later on that could be seized upon to invoke an "impossibility" defense.  App. at 974.  Neither the doctrine of impossibility of performance nor the

doctrine of frustration of purpose was intended to sanction such misconduct.

Accordingly, the District Court's decision granting summary judgment in favor of

Direct Supply and against Specialty Hospitals should be affirmed.

## II.    DIRECT SUPPLY HAS A VALID CLAIM FOR QUANTUM MERUIT

Specialty Hospitals' concludes its brief by addressing Direct Supply's claim

against NFP for quantum meruit, which was pled in the alternative to its claim for

breach of contract against Specialty Hospitals.  However, pursuant to this Court's

Order dated August 30, 2013, the quantum meruit claim is not at issue on this

appeal.  Instead, as the Court explained, in the (unlikely) event that the District

Court's grant of summary judgment on the breach of contract claim were somehow

reversed, then "Direct Supply's quantum meruit claim would no longer be moot,

and the proper disposition would be a remand for the district court to consider the

merits of that claim in the first instance."  Aug. 30 Order at 1.

However, to the extent that the Court wishes to address the issue, Direct

Supply is in agreement with Specialty Hospitals that its alternative claim for

quantum meruit against NFP can proceed even though there is an express contract.

As Specialty Hospitals notes in its brief, the rule precluding quantum meruit claims

if there is a valid express contract does not apply where, as here, the claim is

asserted against one who is not a party to the contract.  See, e.g., RehabCare Group

East, Inc. v. SAK Management Services, LLC, 2010 WL 3307084, at *3 (N.D. Ill.

25

Aug. 18, 2010) (quantum meruit claim allowed to proceed, despite the existence of a valid contract, because the defendant "was not a party to the written contract at issue."); see also Ford v. Pacific Webworks, Inc., 2011 WL 529265, at *4 n. 7 (N.D.Ill. Feb. 4, 2011) ("Further, as Bloosky is not alleged to be a party to a contract with plaintiffs, its argument that Ford's unjust enrichment claim against it is barred because there is a valid contract is unavailing."); Bettis v. Hall, 2011 WL 1430327, at *4 (D.Kan. April 14, 2011) ("Because no valid breach of contract claim exists against Bentley and the Trust, plaintiffs may assert a claim of *quantum meruit* against these defendants."); Everything Parking, Inc. v. Houston Economic Development Ass'n, 2011 WL 2215716, at *3 (M.D.Ala. June 7, 2011) (allowing quantum meruit claim pled against defendant not a party to the contract).

## CONCLUSION

For all of the foregoing reasons, the decision of the District Court below should be affirmed.

Respectfully Submitted,


/s/ Douglas S. Crosno
Douglas S. Crosno DC Bar # 482017
HOGAN LOVELLS US L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
(202) 637-6885
(202) 637-5910 (fax)

26

Attorneys for Plaintiff- Appellee Direct
Supply, Inc.

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed R. App. P. 32(a)(7)(C) and Circuit Rule 32(a), I hereby certify that the foregoing brief was produced using the Times New Roman 14-point typeface and contains 6,040 words.


/s/ Douglas S. Crosno
Douglas S. Crosno

## CERTIFICATE OF SERVICE

I certify that on February 28, 2014, the foregoing Brief For Plaintiff-Appellee Direct Supply, Inc. was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users. I also certify that I caused to be delivered to the Court by messenger the original and eight copies of the brief, pursuant to Circuit Rule 31(b).

/s/ Douglas S. Crosno
Douglas S. Crosno